**FILED**

AUG 30 2019

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AO 91 (Rev. 11/11) Criminal Complaint

AUSA Corey B. Rubenstein (312) 353-8880

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

RAFAEL QUINONEZ;
KEVIN ROCHA

MAGISTRATE JUDGE VALDEZ

CASE NUMBER:

**19CR   696**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about August 29, 2019, at Melrose Park, in the Northern District of Illinois, Eastern Division, the defendants, RAFAEL QUINONEZ and KEVIN ROCHA, violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 846 | The defendants did knowingly and intentionally conspire to possess with intent to distribute and distribute a controlled substance, namely, 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of 21 United States Code, Section 841(a). |

This criminal complaint is based upon these facts:

 X   Continued on the attached sheet.

CHRISTIANA A. OLAGBAIYE
Special Agent, Drug Enforcement Administration
(DEA)

Sworn to before me and signed in my presence.

Date: August 30, 2019

City and state: Chicago, Illinois

Judge's signature

MARIA VALDEZ, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

**AFFIDAVIT**

I, CHRISTIANA A. OLAGBAIYE, being duly sworn, state as follows:

**Background**

1.     I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since approximately October 2015. I am currently assigned to the DEA Chicago Field Division. My official duties include the investigation of drug trafficking organizations and violations of federal narcotics laws, including offenses under 21 U.S.C. §§ 841, 843, and 846. Through investigations, my training and experience, and conversations with other law enforcement officers, I have become familiar with the methods used by narcotics traffickers to distribute, transport, store, import, and safeguard controlled substances, including the methods used to insulate their illegal activities from law enforcement detection. Based on that experience, I am familiar with the coded language frequently used by narcotics traffickers during conversations in an attempt to disguise the true meaning of their conversations.

2.     This affidavit is submitted in support of a criminal complaint alleging that Rafael Quinonez ("QUINONES") and Kevin Rocha ("ROCHA") have violated Title 21, United States Code, Section 846. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging QUINONEZ and ROCHA with conspiracy to possess with intent

to distribute and distribute narcotics, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offense alleged in the complaint.

3.     This affidavit is based on my personal knowledge, my training and experience, my review of audio/video recordings and other evidence, my discussions with a DEA confidential source (the "CS-1"), debriefings from an undercover law enforcement officer posing as a narcotics purchaser (the "UC"), as well as information provided to me by other law enforcement agents and witnesses.

## Statement of Probable Cause

4.     Prior to August 6, 2019, a DEA confidential source ("CS-1")[1], had contact through Facebook with QUINONEZ. According to CS-1, QUINONEZ, who identified himself by name on his Facebook page, had posted a photograph of what appeared to be multiple bricks of cocaine. On or about August 6, 2019, at approximately 3:30 p.m., after having exchanged messages, CS-1 spoke by telephone with QUINONEZ at phone number 708-xxx-9759 to discuss a potential cocaine transaction.[2] The

---

[1] CS-1 is a paid source who has provided DEA with credible, reliable, and timely information since approximately 2014. To date, in total, CS-1 has been paid approximately $25,000 in exchange for information and services provided in DEA cases. I believe the information provided by CS-1 set forth in this affidavit is reliable because it has been corroborated in significant respects by consensually recorded conversations, surveillance, and other information described in this affidavit. CS-1 has a prior misdemeanor conviction for theft.

[2] The identification of QUINONEZ as the user of the 9759 phone number is based, in part, on the following: During the calls between CS-1 and the user of the 9759 phone number, they arranged an in-person meeting, which took place on or about August 6, 2019, as described below. At that meeting, law enforcement observed CS-1 and the UC meet with an individual, who based on a later traffic stop, as described below, has been identified as QUINONEZ. Additionally, from recordings, the UC has been able to identify QUINONEZ as the speaker

telephone call was recorded and was made in the presence of law enforcement.[3]
During that call, QUINONEZ instructed CS-1 to drive to his residence in Franklin
Park, Illinois, to have additional discussions.

5.      At approximately 3:54 p.m. on that same day, the UC and CS-1 drove to
QUINONEZ's residence, and, at QUINONEZ's direction, they parked in the back
alley of the apartment building. Law enforcement performed surveillance of this
meeting.  QUINONEZ approached their vehicle and leaned into the front passenger
window.[4] The UC advised QUINONEZ that the UC was looking to purchase
something that would be "good for cooking [a reference to cocaine that could be cooked
into crack]."[5] QUINONEZ replied that everything he gets is "for pure crack" and is
good for "cooking." QUINONEZ stated that he could get it for the UC at "33 [$33,000
per kilogram]." QUINONEZ then said that if the UC doesn't like it, the UC could

---

on the 9759 number based on the UC's familiarity with QUINONEZ's voice from the meeting
on August 6, 2019, and from the UC's monitoring of the meeting and arrest on August 29,
2019, described below.

[3] Unless otherwise indicated, all the phone calls with QUINONEZ were recorded by law
enforcement.

[4] Law enforcement was familiar with QUINONEZ from having reviewed an Illinois state
identification photograph and Facebook photographs of QUINONEZ.

[5] Some of the recorded conversations have been summarized, translated, and excerpted in
this affidavit. Portions of these communications were in Spanish while others were in
English. The summaries of the recorded conversations do not include all statements made or
topics covered during the course of the recorded conversations. I based certain of the
summaries quoted from the recorded conversations on draft transcripts prepared by DEA
personnel. At various points in this affidavit, I also have indicated (in brackets) my
interpretation of words and phrases used in the recorded conversations. My summaries and
interpretations also are based on the context of the recorded conversations, events occurring
before or after the recorded conversations, information received from confidential sources,
my knowledge of the investigation as a whole, my training and experience, and the training
and experience of other law enforcement officers involved in this investigation.

return it. The UC advised QUINONEZ that the UC needed "one [kilogram]" either that day or the following day. QUINONEZ indicated that he will check with his source and that they can do the transaction the following day.

6.     The next day, on or about August 7, 2019, at approximately 3:54 p.m., QUINONEZ texted CS-1 from the 9759 number stating, "Bad timing sum shit came up I'm just waiting for the call." Later in the evening, QUINONEZ called CS-1 and stated that he will get "it" [the cocaine] in the morning and they can do the deal the following day (August 8, 2019).

7.     On August 8, 2019, at approximately 5:30 p.m., while law enforcement was conducting surveillance on QUINONEZ, they observed QUINONEZ enter a vehicle driven by Individual A, which then picked up Individual B and drove to a storage facility in Melrose Park, Illinois. After stopping at the storage facility, the vehicle dropped off Individual B. Individual A and QUINONEZ then got into a different vehicle driven by Individual C. Law enforcement initiated a traffic stop on that vehicle. Law enforcement searched the vehicle and found approximately $32,509 in United States currency in the glove compartment of the vehicle. QUINONEZ, who was identified by law enforcement by his state identification, had three mobile phones on his person at the time of the traffic stop. Law enforcement did not take any individuals into custody during or as a result of this traffic stop.

8.     The following morning, on or about August 9, 2019, at approximately 9:00 a.m., QUINONEZ called CS-1 from a different phone number, 773-xxx-0240.[6] QUINONEZ told CS-1, "Luckily they [law enforcement] pulled us over before we got to the spot [before they picked up narcotics]," and, "They got us with money, that's it." QUINONEZ then suggested to CS-1, "We'll go straight to my uncle's and pick it [the narcotics] up bro."

9.     During approximately the next two weeks, QUINONEZ had intermittent contact with CS-1. On or about August 28, 2019, QUINONEZ called CS-1 and inquired about the transaction. CS-1 said the "guy" [the UC] was ready to proceed. QUINONES asked, "What does [the UC] want and when?" CS-1 responded, "One or two [kilograms of cocaine]." During subsequent calls that day, QUINONEZ and CS-1 agreed to do the transaction at CS-1's (purported) residence in Melrose Park, Illinois.

10.     On or about August 29, 2019, at approximately 11:37 a.m., while under law enforcement surveillance, the CS-1 was parked in a vehicle at the address in Melrose Park at which CS-1 had previously arranged to meet QUINONEZ. At that time, a Chevy Trailblazer arrived and parked behind CS-1's vehicle. QUINONEZ exited the front passenger seat of the Trailblazer and had a brief conversation with CS-1, during which CS-1 asked to see "it" [the narcotics]. QUINONEZ then directed

---

[6] As with the other telephone, the UC has been able to identify QUINONEZ's voice from the recording of this telephone call and the other calls on that telephone number based on the UC's familiarity with QUINONEZ's voice from the August 6, 2019 meeting and from the UC's monitoring of the meeting and arrest on August 29, 2019.

CS-1 to get into the Trailblazer. QUINONEZ re-entered the front passenger seat of the Trailblazer, and CS-1 entered the rear passenger seat. An individual subsequently identified as KEVIN ROCHA was in the driver's seat.

11.     According to CS-1,[7] after CS-1, ROCHA, and QUINONEZ were in the Trailblazer together, QUINONEZ said to ROCHA, "Show [CS-1]." ROCHA then pulled out from under his seat (the driver's seat) a brick-shaped object wrapped in black tape with clear saran wrap, and ROCHA handed the brick to CS-1. CS-1 took the brick and said, "It's not hollow [less than a full brick of cocaine]." According to CS-1, QUINONEZ responded, "Yeah, I told you it was good [a full brick of cocaine]." CS-1 then handed the brick back to ROCHA, and shortly thereafter CS-1 exited the Trailblazer.

12.     The arrest signal then was given, and law enforcement arrested both ROCHA and QUINONEZ at approximately 11:45 a.m. Upon a search of the Trailblazer, a book bag was recovered from under the driver's seat where ROCHA had been sitting. The bag contained the same brick-shaped object that ROCHA had handed to CS-1, which CS-1 had returned to him. A sample of the substance subsequently field tested positive for cocaine. The brick had a gross weight of approximately 1,216 grams. Law enforcement also recovered from the same book bag under ROCHA's seat a semi-automatic pistol with a loaded magazine. ROCHA was identified from his Illinois driver's license, and, according to a law enforcement database, the Trailblazer was registered to ROCHA.

_____

[7] The meeting in the Trailblazer was not recorded.

13.    Immediately following the arrest, law enforcement verbally provided ROCHA and QUINONEZ with their *Miranda* rights. ROCHA agreed to be interviewed. The initial portion of the interview occurred in a law enforcement vehicle while in transit, and the remainder occurred under video-recording at the DEA offices. ROCHA stated that QUINONEZ called him the previous day and asked if ROCHA had a kilogram of cocaine that they could sell. ROCHA stated to law enforcement officers that he met with QUINONEZ that morning (the morning of the transaction) and brought a kilogram of cocaine to QUINONEZ. ROCHA said that the cocaine was his. ROCHA said that both he and QUINONEZ were going to make $1,500 each for selling the kilogram of cocaine to CS-1 and the UC. ROCHA said that the semi-automatic pistol recovered from the book bag was his, and he brought it with him that morning at QUINONEZ's request because QUINONEZ did not know the buyer of the cocaine.

### Conclusion

14.    Based on the foregoing facts, I respectfully submit that there is probable cause to believe that, on or about August 29, 2019, QUINONEZ and ROCHA did knowingly and intentionally conspire to possess with intent to distribute and distribute a controlled substance, namely, 500 grams or more of a mixture and

substance containing a detectable amount of cocaine, a Schedule II Controlled

Substance, in violation of 21 United States Code, Section 841(a), in violation of Title

21, United States Code, Section 846.

FURTHER AFFIANT SAYETH NOT.

CHRISTIANA A. OLAGBAIYE
Special Agent, Drug Enforcement
Administration

SUBSCRIBED AND SWORN to before me on August 30, 2019.

MARIA VALDEZ
United States Magistrate Judge

8